IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEN HERITAGE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-211 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| LAKE PLAZA PROPERTY HOLDING, LLC, AND NOVARE NATIONAL SETTLEMENT SERVICE, LLC, in its capacity as escrowee, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are cross motions for summary judgment from Plaintiff Ken Heritage LLC [57] and Defendant Lake Plaza Property Holding, LLC [59]. For the reasons set forth below, both motions are granted in part and denied in part. The Court grants Plaintiff's motion for summary judgment on its Count I, and judgment is accordingly entered in Plaintiff's favor on that count. The Court grants Defendant's cross motion for summary judgment on Plaintiff's Counts II, IV, and V, and judgment is accordingly entered in Defendant's favor on those counts. The case is set for further status on February 19, 2020 at 9:00 a.m.

**I.    Background[1]**

The present dispute concerns the botched sale of a commercial business property (the "Property") in Country Club Hills, Illinois. [67 at 1, ¶ 1.] The Property has at least eighteen suites

---

[1] The Court takes the relevant facts from the parties' Local Rule 56.1 statements of undisputed material facts and supporting exhibits: [60], [61], [67], [69]. The Court construes the facts in the light most favorable to the nonmoving party on any given issue. The following facts are undisputed unless otherwise noted. "When we cite as undisputed a statement of fact that a party has attempted to dispute, it reflects our determination that the evidence cited in the response does not show that the fact is in genuine dispute." King v. Chapman, 2013 WL 6709623, at *3 (N.D. Ill. Dec. 16, 2013).

leased to such tenants as Dollar General, United Liquor Mart, and State Farm. [69 at 1, 4–5, ¶¶ 2, 18.] The seller, Defendant and Counterclaimant Lake Plaza Property Holding LLC ("Defendant"), used the online auction hub Ten-X to facilitate the sale of the Property. [69 at 2, ¶ 6.] Ten-X is an online portal, on which sellers can post information about a property, and potential purchasers can consult those documents and, if interested, place bids. See [69 at 3–4, ¶¶ 12–13].

Marshall Weisman ("Weisman") is a real estate investor and developer, with over 35 years of experience. [69 at 2, ¶ 6.] Weisman is the co-owner of Plaintiff and Counterdefendant Ken Heritage ("Plaintiff"). He acted as Plaintiff's agent in investigating and bidding on the Property at issue here.[2] See [67 at 4, ¶ 8]; [69 at 8, ¶ 33]. Weisman is generally familiar with Ten-X, having successfully purchased three other properties using the platform. [69 at 2, ¶ 6.] Weisman admitted, however, that Ten-X is not the optimal platform for clear and accurate disclosures. He said in an email that "All the tenx buyers are cowboys who buy based on the proforma and realize that it's usually correct and understand that the back up paperwork is sloppy." [69 at 8, ¶ 31.][3]

In this case, Defendant uploaded a "Due Diligence Vault" ("Vault") to Ten-X with 41 documents, totaling over 1,000 pages. [69 at 4, ¶ 15]; see also, generally, [61-10]; [61-11]; [61-12]; [61-13]; [61-14]. Among those documents was an "Offering Memorandum" that contained Defendant's pitch. [69 at 5, ¶ 19.] Defendant also included a "Rent Roll" that was current as of June 26, 2017, purporting to list how much each tenant paid in rent, along with various taxes, shared expenses, and costs of running the property. See [69 at 6, ¶ 22]; [61-11 at 328 (showing

---

[2] Plaintiff is the assignee of all obligations, duties, and rights to the contract, discussed below, signed by the purchaser, 120 Elmurst LLC. See [69 at 2, ¶ 5]. Weisman is the owner of 120 Elmurst as well. [*Id.* at 2, ¶ 6.] For simplicity's sake, the Court treats the assignee Plaintiff as if it were the primary actor.

[3] Weisman elaborated in his deposition that in his experience, the important information would be correct but the backup would be missing. [61-6 at 28:14–20.] But, Weisman acknowledged that there "is a minority of people out there who would not buy a Ten-X thing because it's just not a perfect package, which is okay." [*Id.* at 30:16–18.]

annual net operating income of $385,893.36)]. The Vault also had copies of the then-current leases, which were updated as new tenants or leases came online. [69 at 4–5, ¶ 18]. Not all the newly uploaded leases, however, were executed by the lessee. See [69 at 6, ¶ 21]. Defendant accepted bids on the property starting no later than June 21, 2017 through August 9, 2017; the Vault was available throughout that window. [67 at 4, 8, ¶¶ 17, 33]; [61-15].

During the bidding period, Defendant had undisclosed rent issues with some of its tenants. As is relevant here, as of August 10th, one of the tenants, M.P., had not paid her rent for June, July, or August—that is, she was several months delinquent.[4] [67 at 6–7, ¶ 22]; [60-1 at 121.] There is no indication that M.P.'s delinquency was disclosed in the Vault. As it turns out, M.P. finally paid her June rent—and only her June rent—on August 16, 2017. [68-1 at 14]; see also [67 at 6–7, ¶ 22 (arguing that *a* rent payment was made before the end of the month)].[5]

Although the Vault had been available since at least June 21, 2017, Weisman did not access it until August 8th, the day before bidding on the Property closed. [69 at 7, ¶ 27.] Upon his review of the Vault, however, he realized that the numbers did not add up—specifically, the aggregate financial data did not match the terms of the respective leases. [67 at 4, ¶ 10.] He reached out to Defendant's agent, asking for an explanation for the inconsistent totals. [67 at 4, ¶¶ 9–10.] The

---

[4] Defendant argues that it did not consider rent due until the end of the month; thus, according to Defendant, the August rent was not due until August 31st. See [67 at 6–7, ¶ 22]; [69 at 12, ¶ 50.] Preliminarily, this practice contradicts the plain terms of the lease, which explain that the "time of each and every payment of rent is of the essence of this lease" and thus must be paid "and in Lessor's hand by 5:00 PM on the 5th day of the month." [61-11 at 70, ¶ 33.] And, even if Defendant's practice comported with its lease agreement with M.P., her rent for June and July was unequivocally late. [67 at 6–7, ¶ 22]; [60-1 at 121.]

[5] The Court acknowledges that Plaintiff's attachment to its response brief does not comport with Local Rule 56.1. But, the Court may exercise its discretion in the direction of leniency and consider the noncompliant submission. *E.g.*, *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013). Here, Defendant has not objected to the inclusion of these materials. Moreover, the denial that the exhibit undercuts does not cite to any admissible evidence suggesting that M.P. ever paid her June or July rent, and thus only underscores the conclusion that the Court could have reached on its own—that M.P. was still months behind on rent by the end of August 2017.

two exchanged emails, during which the Defendant's agent provided more numbers that did not add up, and Weisman again asked for an explanation. [67 at 4, ¶¶ 9–12.] When Defendant's agent then provided a spreadsheet as an attachment, Weisman responded, asking, "is this now 100 pct accurate and correct? Please confirm that Seller is stating that these are the current accurate numbers (need that because this 3rd set I'm seeing)." [67 at 5, ¶ 14.]. Defendant's agent responded, "And yes. ALL OF THESE NUMBERS ARE CORRECT." [67 AT 5, ¶ 15.] This is the point when Weisman acknowledged that Ten-X bidders are "cowboys" and that the paperwork is often "sloppy." [69 at 7, ¶ 31.] A few hours later, Weisman requested a further follow up, asking for, among other things the current insurance bill, recent utility bills, and a "register" of lease payments received. [69 at 7, ¶ 32.]

Weisman then submitted the highest bid of $3 million (to which a $150,000 Ten-X fee was added for a total purchase price of $3,150,000). [69 at 7, ¶ 33.] The next day, August 10, 2017, Weisman executed a contract (the "Agreement") with Defendant on behalf of Plaintiff. See, *e.g.*, [61-4 at 11.] The Agreement required Plaintiff to deposit $157,000 in "Earnest Money" up front. [69 at 8–9, ¶ 34.] A closing date was set for September 10, 2017. [69 at 11, ¶ 44.] After Plaintiff signed, however, he realized that "ALL OF THESE NUMBERS" were not correct and that the Rent Roll spreadsheets he had been sent overstated the current income of the Property as of August 10th.[6] See, *e.g.*, [67 at 7, ¶ 23.]

The parties then tried to sort out the numbers issue, along with other wrinkles in the Agreement, before closing. During these exchanges, Defendant further updated its Rent Roll

---

[6] Defendant argues that, at the very least, viewing the email exchange in the light most favorable to it, it is unclear which set of numbers he was referring to. Or, in the alternative, since the numbers were correct at some point, its agent's response was not incorrect. [67 at 5, ¶ 16.] These readings belie the words used in the exchange—Plaintiff asked if "these" numbers were "correct" *and* "current." Defendant's affirmative response cannot be read as anything other than a representation that the Rent Roll was correct and current.

4

submissions; these updated numbers, on the aggregate, showed the annual net operating income reduced from $385,893.36 to no more than $367,188.56. [67 at 7–8, ¶¶ 23–27.]. These updates, however, contained information that already was contained in the current leases which had been uploaded to the Vault. [69 at 18–19, 13, ¶¶ 18, 53.] During these conversations, the Agreement was amended three times. [69 at 11–12, ¶¶ 46–48.] On September 20, Plaintiff sent a letter to Defendant indicating that it would not go through with the closing because of the various misrepresentations Defendant allegedly made, including the Rent Roll issue and others discussed below. [69 at 15, ¶¶ 59–60.]

Plaintiff then sued Defendant and the escrow company with which it had deposited its Earnest Money deposit. See generally [1]. In the operative complaint [53], Plaintiff brings five counts against Defendant: breach of contract (Count I) [53, ¶¶ 42–49]; rescission on a misrepresentation theory (Count II) [*id.*, ¶¶ 50–60]; fraud (Count III) [*id.*, ¶¶ 61–80]; breach of duty of good faith and fair dealing (Count IV) [*id.*, ¶¶ 81–89]; and rescission on a unilateral mistake theory (Count V) [*id.*, ¶¶ 90–112]. Defendant counterclaimed [9] with two counts of its own: declaratory judgment (Counterclaim I) [9, ¶¶ 33–36] and breach of contract (Counterclaim II) [*id.*, ¶¶ 37–41]. Before the Court are cross motions for summary judgment. See generally [57]; [59]. Plaintiff seeks summary judgment [57] on its Counts I, II, and V, and Defendant [59] seeks summary judgment on all claims—both its own and Plaintiff's.

## II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, the Court will not draw inferences that are "supported by only speculation or conjecture," *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008)) (internal citations omitted), and "[c]onclusory allegations alone cannot defeat a motion for summary judgment." *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892 (7th Cir. 2003). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).[7]

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014) (quoting *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008)). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

---

[7] Generally, the Court deals with cross-motions for summary judgment one at a time, construing all facts and drawing all reasonable inference in favor of the non-moving party. *Black Earth Meat Mkt., LLC v. Vill. of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016). Because the disputed issues in this case center on legal issues, the Court does not do so here. To the extent that inferences could be made, the Court has made inferences in favor of the non-moving party on each issue.

56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

"Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)); see also *Anderson*, 477 U.S. at 250. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex*, 477 U.S. at 323. The Court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

## III. Analysis

The case at bar is, at heart, a contract dispute. The Court accordingly turns to Illinois[8] contract law. "The primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher v. Lenart*, 226 Ill.2d 208, 232 (2007). The language of a contract provides the best indication of that intent. *Id*. (citation omitted); see also *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 870 F.3d 682, 690 (7th Cir. 2017) (applying Illinois contract law) ("A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent."). If the contract's language is facially unambiguous, its words "must be given their plain, ordinary, and popular meaning." *Central*

---

[8] Both parties assume that Illinois law applies. Because (1) federal courts sitting in diversity apply the choice of law rules of the state in which they sit, *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941), and (2) Illinois courts apply forum law in the absence of an actual conflict, *Bridgeview Health Care Center, Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 909 (Ill. 2014), Illinois contract law is applicable.

*Illinois Light Co. v. Home Ins. Co.*, 213 Ill.2d 141, 154 (2004). If the contract's language is susceptible of more than one meaning, it is ambiguous and the court can consider extrinsic evidence to determine the parties' intent. *Right Field Rooftops*, 870 F.3d at 690. All portions of a contract should be "construed as a whole, viewing each part in light of the others." *Gallagher* 226 Ill.2d at 233 (citation omitted). In so construing a contract, a court should "attempt to give meaning to every provision of the contract and avoid a construction that would render a provision superfluous." *Land of Lincoln Goodwill Indus., Inc. v. PNC Fin. Servs. Grp., Inc.*, 762 F.3d 673, 679 (7th Cir. 2014).

First the Court turns to the parties' cross motions on Plaintiff's Count I (breach of contract). Next, the Court considers Defendant's motion for summary judgment on Plaintiff's Count III (fraud). These two analyses more or less dictate the outcomes in all of the remaining claims, which are addressed in quick succession.

### A. Plaintiff's Count I (Breach of Contract)

Plaintiff argues that it is entitled to summary judgment on its Count I (breach of contract), because the parties had a valid contract that forbade Defendant from making misrepresentations regarding the property and Defendant in fact made such misrepresentations. Defendant argues that it is entitled to summary judgment because its statements were not incorrect, and, in any event, Plaintiff disclaimed reliance on any representations and warranties that were not included in the Agreement.

"To succeed on a claim for breach of contract, a plaintiff must plead and prove (1) the existence of a contract, (2) the performance of its conditions by the plaintiff, (3) a breach by the defendant, and (4) damages as a result of the breach." *Kopley Group V., L.P. v. Sheridan Edgewater Properties, Ltd.*, 376 Ill. App. 3d 1006, 1014 (1st Dist. 2007) (citation omitted). Here,

the parties agree on three of the four elements: that there was a valid contract [59 at 4]; [57 at 9–10]; that Plaintiff initially performed and then did not go through with closing [59 at 2, 6]; [57 at 9–10]; and Plaintiff is out at least $157,000 [59 at 2]; [57 at 9–10]. The only question is whether Defendant breached (thereby excusing Plaintiff's nonperformance). [57 at 10]; see also [59 at 6 (acknowledging that the Agreement excused Plaintiff's nonperformance if Defendant did not meet the conditions precedent laid out therein)].

The most obvious starting place is the Agreement itself, specifically Paragraph 5 of the Agreement, "Conditions Precedent to Closing." See 61-4, ¶ 5.] According to this paragraph, Plaintiff was required to close only if "[a]ll representations and warrantees of [Defendant] in this Agreement shall be true, correct, and complete in all material respects * * *." [*Id.*, ¶ 5(B)(i).] Paragraph 10(D) defines Defendant's Representations and Warranties regarding Leases. In relevant part, Paragraph 10(D) provides that "except as would not be reasonably expected to have a material adverse effect on the ongoing business or operation of the Property, to Seller's actual knowledge, (i) each of the Leases is in full force and effect; (ii) there are no uncured defaults under any of the Leases or circumstances which with the giving of notice, the passage of time or both would constitute a default under any of the Leases; * * *." [61-4, ¶ 10(D).]

That is, Defendant's "actual knowledge" of a "material" "uncured default" (or circumstances that would constitute default) would secure summary judgment for Plaintiff, because Defendant would have breached a condition precedent to Plaintiff's obligation to go through with closing. See [59 at 6–7]. Likewise, as the non-breaching party, Plaintiff would be entitled to its earnest money deposit back. See [61-4, ¶ 8(A)].

Plaintiff argues that at least one tenant, M.P., was in default, or circumstances which would give rise to default under her lease, and that Defendant had actual knowledge of this at the time of

contracting. Plaintiff's smoking gun evidence on this front is a letter, addressed to M.P. from the president of Lake Plaza Property Holding, LLC titled "RE: Delinquent Late Fees and Past Dues." [60-1 at 121 (Exhibit 12).] The letter is dated August 10th, 2017, (*i.e.* the same date that the agreement was signed), and explains that Defendant had "not received monthly rent and late fees for June~August [sic] of 2017." [*Id.*] Defendant's Rule 30(b)(6) witness further admitted Defendant's knowledge of M.P.'s delinquency of her June, July, and August rent in a deposition. See [60-1 at 78–79]. This delinquency remained uncured throughout the pre-closing period.

Plaintiff's argument is simple: (1) M.P. failed to pay rent, putting her in default and (2) Defendant's representation that she was not in default was a breach of a condition precedent, excusing its refusal to close. Preliminarily, the Court must determine whether M.P.'s delinquency constituted "default" under the ordinary meaning of the term. See *Central Illinois Light*, 213 Ill.2d at 154. According to Black's Law Dictionary, "default" is "the omission or failure to perform a legal or contractual duty; [especially] the failure to pay a debt when due." Black's Law Dictionary (11th ed. 2019). Likewise, Merriam Webster defines "default" as the "failure to do something required by duty or law;" "to default" is "to fail to fulfill a contract, agreement or duty." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/default (Definitions 1:1 and 2:1) (Last accessed 1/28/2020). According to the plain meaning of the Agreement, M.P. was in default because she failed to perform the contractual duty of paying rent. Thus, Defendant breached a condition precedent in the Agreement.

Defendant's counterarguments are unconvincing. First, Defendant argues that M.P. was not actually late in paying her rent, because Defendant customarily accepted rent through the end of the month. See [61, ¶ 50 (citing [61-3 at 2, ¶ 10]; [61-23 at 4, ¶ 5])]. As noted above, even if this practice comported with the terms of M.P.'s lease, Defendant does not—and cannot—argue

that M.P. paid the June or July rent on time. [67 at 6–7, ¶ 22]; [60-1 at 121.] As such, M.P. was several months behind on her rent. Likewise, even though M.P. paid one month's rent on August 16, she was still in default regarding the other months.

Defendant tries to sidestep by arguing that this was not an "actual default[]," whatever that means. See [66 at 7]. As the Court understands this argument, it is that Defendant did not provide notice, try to evict M.P., or solemnly declare the word "default." Regardless, M.P.'s tenancy was in "circumstances which with the giving of notice, the passage of time or both would constitute a default." [61-4, ¶ 10(D)].[9] The fact that Defendant did not, in fact, threaten to or actually evict M.P. is of no moment in determining the veracity of Defendant's representations in the Agreement. That is, Defendant warranted that the leases were paid up, and its representation was not accurate.

Defendant further argues that Plaintiff purchased the property "as is" and therefore must live with any defaulted renter, notwithstanding Defendant's representations and warranties in the Agreement. Such a broad interpretation of the as-is clause, however, would render the entirety of the representations and warranties section superfluous. Because Illinois law frowns on reading portions of a contract as superfluous, this argument must be rejected. *Land of Lincoln Goodwill*,

---

[9] M.P.'s lease contains a lot of strong language about the importance of paying rent on time and the consequences for the failure to do so. For example, M.P.'s lease provides that:
> in case of nonpayment of the rent reserved hereby, or any part thereof * * *, Lessee's right to the possession of the Premises thereupon shall terminate with or (to the extent permitted by law) without any notice or demand whatsoever, * * * and if the Lessor so elects, but not otherwise, and with or without notice of such election or any notice or demanded whatsoever, this lease shall thereupon terminate, and upon the termination or Lessee's right of possession, as aforesaid, whether this lease be terminated or not, Lessee agrees to surrender possession of the Premises immediately, without the receipt of any demand for rent, notice to quit, or demand for possession of the Premises whatsoever * * *. The acceptance of rent, whether in a single instance or repeatedly, after it falls due, or after acknowledge of any breach hereof by Lessee, or the giving or making of any notice or demand, * * * shall not be construed as a waiver of Lessor's right to act without notice or demand or of any other right hereby given Lessor or as an election not to proceed under the provisions of this lease. [61-11 at 70–71, ¶ 36 (Document 25).]

762 F.3d at 679; see also *NAR Business Park, LLC v. Ozark Automotive Distributors, LLC*, 2019 WL 7401503, at *5 (N.D. Ill. Dec. 30, 2019) (rejecting similarly broad argument regarding an "as-is" clause). Construing the as-is clause in context, it refers to the physical condition and location of the property. [61-4, ¶ 9(B)]; see also *Gallagher* 226 Ill.2d at 233 (citation omitted).

Finally, Defendant claims that it need only provide information that is mostly accurate. It points to another paragraph in the representations and warranties section of the Agreement, which provides that Defendant warrants that "[t]he written information regarding the Property provided to Buyer by or on behalf of Seller, taken as a whole (i.e. including any updates or revisions provided), is accurate in all material respects." See, *e.g.*, [59 at 7, 10 (quoting [61-4, ¶ 10(B))]. Basically, Defendant reads the words "taken as a whole" to mean "ish." This argument fails for at least two reasons. First, the plain terms of the contract define "taken as a whole" to mean "including any updates or revisions provided." Because there is no indication that Defendant updated or revised its inaccurate representations regarding the M.P. lease, its representations, "taken as a whole" were still inaccurate. Second, the "taken as a whole" provision only applies to Defendants representations regarding the "Property Condition and Attributes," not the "Leases." Because the misrepresentation was about the leases, this clause does not even apply.[10]

---

[10] Defendant gestures at the language in the Agreement excepting defaults that would not be "reasonably expected to have a material adverse effect on the ongoing business or operation of the Property." Because Defendant does not flesh out this argument, it is waived. See, *e.g.*, *Myumyun v. Gonzales*, 171 Fed. Appx. 526, 527 (7th Cir. 2006) ("Conclusory or undeveloped arguments are waived."); *Elizarri v. Sheriff of Cook County*, 2017 WL 5900277, at *3 (N.D. Ill. Feb. 15, 2017) (refusing to consider inadequately briefed issues). In any event, using the ordinary meaning of "lease" as a starting point, the whole point of a lease from the lessor's perspective is to collect rent. See, *e.g.*, Black's Law Dictionary (11th ed. 2019) ("A contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration, [usually] rent.") That is, serial non-payment of rent would necessarily have an adverse effect on the ongoing business of any landlord, because collecting rent is their ongoing business. See *Justine Realty Co. v. American Nat. Can Co.*, 976 F.2d 385, 391 (8th Cir. 1992) ("Under Illinois law, failure to pay an installment when due frequently has been found to be a material breach of a contract.") (citations omitted). And any argument to the contrary is belied by the text of M.P.'s lease, which is incorporated by reference into the Agreement. See [61-4, ¶ 10]. For example, M.P.'s lease states that the "time of each and every payment of rent is of the essence of this lease," and therefore must be "paid and in

12

All of this to say, because Defendant had actual notice of M.P.'s default, Defendant breached the Agreement. Plaintiff is, accordingly, entitled to summary judgment on its Count I, for breach of contract. Judgment on this Count is entered for the Plaintiff against defendant. That said, Plaintiff has not highlighted any evidence of damages beyond the earnest money deposit.

### B. Plaintiff's Count III (Fraud)

Defendant has moved for summary judgment on Plaintiff's Count III for fraud, stemming from either (1) the barrage of incorrect financial data sent on August 9th, or (2) Defendant's assurance that all leases were in good order. In Illinois, the elements of a fraud claim are: "(1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury." *Cramer v. Insurance Exchange Agency*, 174 Ill. 2d 513, 528 (1996) (quotation marks and citation omitted). "Most importantly, fraud must be proved by clear and convincing evidence." *Association Ben. Services, Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 852–53 (7th Cir. 2007) (quoting *Williams v. Chicago Osteopathic Health Systems*, 274 Ill. App. 3d 1039, 1048 (1st Dist. 1995)).

Plaintiff may proceed on the fraud count as it pertains to lease misrepresentation. In its motion for summary judgment, Defendant acknowledges that the misrepresenations regarding the currentness of the tenants' rent payments are part of the fraud allegations. [59 at 11.] Yet, Defendant makes *no* argument as to why these facts cannot, as a matter of law, give rise to a fraud claim [*Id.* at 11–13.] To the extent that Defendant's arguments are relevant, it appears to argue that

---

[Defendant's] hand by 5:00 PM on" the due date. [61-11 at 70, ¶ 33.] The lease elaborates that non-payment of rent "shall terminate" any right of possession M.P. had. [*Id.* at 70–71, ¶ 36.]

13

Plaintiff has not adduced any evidence of scienter. [*Id.* at 12.] But, as explained above, M.P.'s lease was not paid up and Defendant knew it—that is, it made a false statement that it knew was incorrect. Because Defendant's argument is contradicted by the evidence at hand, it has not met its burden at summary judgment. *Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 323. Neither party has briefed, however, whether, under Illinois law, a plaintiff may prevail on both a breach of contract and fraud claim related to the same inaccurate representation. The Court will not reach out to decide this unbriefed issue. At least as of right now, then, this Count may proceed.

In the interest of judicial economy, the Court will address the issues regarding the Rent Roll. Defendant claims that Plaintiff waived any right to pursue a fraud claim by disclaiming reliance on any external representations. Defendant further argues that there is insufficient evidence of scienter and that no reasonable jury could conclude that Plaintiff's reliance on the various Rent Rolls was justifiable.

Here, Defendant has demonstrated that Plaintiff's reliance was not reasonable as a matter of law.[11] Generally speaking, determining the reasonableness of reliance is a question of fact, because it requires considering "all of the circumstances surrounding the transactions, including the parties' relative knowledge of the facts available, opportunity to investigate the facts and prior business experience." *Runnemede Owners, Inc. v. Crest Mortg. Corp.*, 861 F.2d 1053, 1058 (7th Cir. 1988) (quoting *Luciani v. Bestor*, 106 Ill.App.3d 878, 884 (3d Dist. 1982)); see also *Prince-Servance v. BankUnited, FSB*, 2007 WL 3254432, at *7 (N.D. Ill. Nov. 1, 2007) (citing *Reis Robotics USA, Inc. v. Concept Indus.*, 462 F. Supp. 2d 897, 910 (N.D. Ill. 2006)). That said, courts consistently hold that when extrinsic representations contradict explicit contract terms, a sophisticated party's reliance on the extrinsic representations over the contract language is

---

[11] Because the Court finds that this aspect of the fraud claim fails as a matter of law, it need not address Defendant's two alternative arguments.

14

unjustifiable as a matter of law. *Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc.*, 250 F.3d 570, 574–75 (7th Cir. 2001) ("As long as the complaining party could have discovered the fraud by reading the contract and had the opportunity to do so, Illinois courts have refused to" find reliance reasonable.) (citations omitted); *Runnemede Owners*, 861 F.2d at 1058–59 (affirming Rule 12(b)(6) dismissal where plaintiff, "an experienced businessman," relied on "oral representations inconsistent with the written terms of the contract" and other claims "directly contrary to the specific [] terms of the parties' written contract."); *DigaComm, LLC v. Vehicle Safety and Compliance, LLC*, 2009 WL 509736, at *5 (N.D. Ill. Mar. 2, 2009) (granting summary judgment to fraud defendant where a sophisticated plaintiff relied on representations inconsistent with the contract language). The case at bar is almost indistinguishable from those cases: Weisman's reliance was unreasonable because he credited extrinsic information over the Agreement's express terms. That is, "[t]aking into consideration that [Weisman] is an experienced businessman, he certainly should have proceeded with caution when confronted with [extrinsic] representations inconsistent with the written terms of the contract." *Runnemede Owners*, 861 F.2d at 1059. Moreover, the Rent Rolls at issue here were especially undeserving of credence given that the numbers repeatedly changed, and Weisman even acknowledged that these numbers did not add up as compared to the leases. [67 at 4–5, ¶¶ 10–14.] Any argument to the contrary is further belied by the fact that Weisman sent a further follow-up email asking for additional information, which was largely duplicative of what was contained in the Rent Roll, suggesting that he did not have confidence in the numbers.

    **C.**    **Remaining Counts**

Because Plaintiff has prevailed on Count I, it is not entitled to its alternative remedy of rescission. Under Illinois law, the equitable remedy of rescission "is not available where there is

an adequate remedy at law." *Newton v. Aitken*, 260 Ill. App. 3d 717, 720 (2d Dist. 1994) (citing *Scott & Fetzer Co. v. Montgomery Ward & Co., Inc.*, 129 Ill. App. 3d 1011, 1021 (1st Dist. 1984)); see also *Pardo v. Mecum*, 77 F. Supp. 3d 703, 711–12 (N.D. Ill. 2014) (explaining that rescission and breach of contract "are inconsistent" and thus "cannot both be awarded") (citations omitted). Here, the contract provides that if Defendant breached, Plaintiff would be entitled to, *inter alia*, its deposit back. [61-4, ¶ 8(A).] This remedy is adequate, and, in any event, is essentially what would happen if the contract were rescinded; thus the contract will not be rescinded. *Newton*, 260 Ill. App. 3d at 720. Plaintiff's motion for summary judgment on its Counts II and V is denied, and Defendant's motion for summary judgment on Plaintiff's Counts II and V is granted; judgment is entered on Defendant's behalf against Plaintiff on these Counts.

Next, Defendant cannot prevail on its counterclaims (Counterclaims I and II), which are predicated on Plaintiff's breach of the Agreement. Briefly, Defendant claims that Plaintiff breached by failing to close. The Agreement provides, however, that Plaintiff was only obligated to close provided that "[a]ll representations and warranties of Seller in this Agreement shall be true, correct and complete in all material respects as of the Closing Date." [61-4, ¶ 5(B)(i).] Defendant has hardly demonstrated that its representations and warranties—which include that no leases were in default—were "were true, correct, and complete." Indeed, as explained above, at least one tenant was in default or constructive default. Thus, Defendant's motion for summary judgment on its counterclaims is denied. Plaintiff has not moved for summary judgment on these counts, so judgment is not entered on its behalf. This opinion, however, provides notice pursuant to Rule 56(f) that the Court intends to consider whether summary judgment is warranted on Plaintiff's behalf on these counts.

Finally, Defendant is entitled to summary judgment on Plaintiff's Count IV, for breach of good faith and fair dealing. Preliminarily, Plaintiff does not even defend this Count or explain why summary judgment is not warranted in its response brief. See generally [68]. In any event, "under Illinois law, the covenant of good faith and fair dealing has never been an independent source of duties for the parties to a contract. A lack of good faith does not by itself create a cause of action * * *." *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992); see also, *e.g.*, *Wilson v. Career Educ. Corp*, 729 F.3d 665, 673–74 (7th Cir. 2013) (Darrow, J. concurring) ("Thus, an alleged violation of the implied covenant of good faith cannot form the basis of an independent tort action or even its own cause of action.") (citations omitted); *id.* at 687 (Wood, J., concurring in part and dissenting in part) ("Illinois courts [] hold that the covenant of good faith and fair dealing is not an independent source of duties for the parties to a contract."). Accordingly, Defendant is entitled to summary judgment on Plaintiff's Count IV, and judgment is entered on Defendant's behalf.

## IV. Conclusion

For the foregoing reasons, Plaintiff's cross-motion for summary judgment [57] is granted in part and denied in part and Defendant's cross-motion for summary judgment [59] is granted in part and denied in part. Judgment is entered in Plaintiff's favor and against Defendant on Plaintiff's Count I. Judgment is entered in Defendant's favor and against Plaintiff on Plaintiff's Counts II, IV, and V. The case is set for further status on February 19, 2020 at 9:00 a.m.

Dated: February 3, 2020

Robert M. Dow, Jr.
United States District Judge